U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed February 10, 2009      **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JAMES E. CASTELLAW and | § | CASE NO. 08-34300-SGJ-7 |
| JENNIFER L. CASTELLAW, | § | |
| | § | |
| D E B T O R S. | § | |

**MEMORANDUM OPINION[1] AND ORDER GRANTING UNITED STATES TRUSTEE'S
MOTION TO DISMISS AS AN "ABUSE"
UNDER 11 U.S.C. § 707(b)(1) AND/OR (b)(3)**

## I. Introduction.

The United States Trustee ("UST") has moved to dismiss the
Chapter 7 case of James and Jennifer Castellaw (the "Debtors" or
"Castellaws"), pursuant to 11 U.S.C. § 707(b)(1) and (b)(3), on
the grounds that granting a Chapter 7 discharge would be an

---

[1]This constitutes the court's findings of fact and
conclusions of law with regard to Docket Entry # 27 tried
February 4, 2009. *See* Fed. R. Bankr. P. 7052(a)(1) and 9014(c).
Where appropriate, any finding that should be regarded as a
conclusion shall be regarded as such, and *vice versa*. The court
reserves the right to supplement or amend these findings and
conclusions.

"abuse" of the provisions of Chapter 7, under the totality of the circumstances of the Debtors' financial situation and/or because the Debtors filed their case in bad faith.[2]  In this case, the "presumption of abuse" is not triggered by the ability-to-pay threshold or "means testing" formula set forth in 11 U.S.C. § 707(b)(2).

The court has jurisdiction in this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  This case requires the court to analyze certain changes made by Congress to section 707(b)(1) and (b)(3) in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  Prior to BAPCPA, dismissal of a Chapter 7 case was appropriate if a court found that granting the debtor relief (*i.e.,* a Chapter 7 discharge)[3] would be a "**substantial** abuse" of the provisions of Chapter 7.  There was also a presumption in favor of granting the Debtor relief in Chapter 7.[4]  In BAPCPA,

---

[2]It is stipulated that the Debtors have primarily consumer debt.  It is also stipulated that the Debtors are not eligible to be Chapter 13 debtors.  11 U.S.C. § 109(e).

[3]*See In re Cortez*, 457 F.3d 448, 454-55 (5th Cir. 2006) ("Although 'granting of relief' is undefined [in section 707(b)], its context reveals that it is referring to a Chapter 7 discharge, and not the relief associated with the commencement of the case under § 301.").

[4]*See* former 11 U.S.C. § 707(b)(1), as it existed prior to the enactment of BAPCPA.

notably, Congress deleted the adjective "substantial" from the statute (*i.e.,* so that mere "abuse," not "substantial abuse," warrants dismissal).  Congress also eliminated the presumption in favor of allowing a debtor to proceed in his case.  Both of these changes suggest that bankruptcy courts should lower their threshold for what sorts of behavior should disqualify an individual from going forward in Chapter 7.[5]

Anecdotally, this court notes that it sees all sorts of consumer debtors come through the bankruptcy system.  At one end

---

[5]The court notes that some have posited that, once a debtor "passes" the "means test" of section 707(b)(2) (so that there is no presumption of abuse, as is the case with the Castellaws), the debtor's financial situation is irrelevant to finding "abuse," and relief in Chapter 7 can only be denied for dishonesty or similar serious debtor misconduct.  *See M.B. Culhane and M.M. White, Catching Can-Pay Debtors:  Is the Means Test the Only Way?,* 13 AM. BANKR. INST. L. REV. 665 (2005).  *See also* discussion in *In re Johnson,* 2008 WL 5265740 (Bankr. S.D. Cal. Dec. 8, 2008).  This court disagrees with such an argument and will fully examine the Debtors' overall financial situation in the case at bar.  *See E.R. Wedoff, Judicial Discretion to Find Abuse under § 707(b)(3)*, ABI JOURNAL, Apr. 2006, at 1.  In other words, even if a debtor "passes" the "means test"—which is not necessarily as "mean" as is sometimes suggested, since it allows a deduction from income in the amount of the ***actual secured debt payments*** that the debtor is obligated to make to maintain possession of the debtor's primary residence or a motor vehicle, 11 U.S.C. § 707(b)(2)(A)(iii)—this court believes that Congress intended to give bankruptcy courts discretion to still find "abuse" under the totality of circumstances.  Contrary to some popular opinion, BAPCPA did not eliminate all discretion of bankruptcy judges.  This court agrees with Judge Wedoff that the "means test" serves as a guide, rather than to foreclose, determinations of abuse.  *Id.*

of the spectrum, there are individuals who have been plagued with many bad circumstances that have led to their financial demise—such as health problems, injuries, medical bills, job loss or instability, divorce, or death of a bread winner.  At the other end of the spectrum, there are individuals who have been blessed with good health and adequate jobs and resources, and yet have somehow created a mountain of consumer debt that they (and probably their creditors) should have known could never be repaid.  Some of these latter individuals have even engaged in some sort of fraud along the way—perhaps in a loan application at some point, or with intentional avoidance and nonpayment of taxes, or by hiding assets before entering into bankruptcy.

But the vast majority of debtors this court sees fall somewhere between the two extremes.  They are individuals who probably cannot honestly blame "bad luck" as the cause of all of their woes.  And many of them have made more poor choices than wise ones, and such choices have finally caught up with them.

So when do these poor choices of a consumer debtor (ultimately leading to a choice—good or bad—to file bankruptcy) cross into the realm of "abuse" under the totality of the circumstances of the debtor's financial situation or, alternatively, cross over into bad faith?  The Castellaws' case requires this court to explore this question.

**II.  Relevant Facts.**

A.  <u>Attributes of the Debtors.</u>

The Castellaws filed their Chapter 7 bankruptcy case on August 29, 2008 (the "Petition Date").  Mr. Castellaw, a former school teacher and high school football coach for 16 years, with a Bachelor's Degree and Master's Degree, has spent the past approximately 15 years as a residential mortgage broker.  Mr. Castellaw is currently employed with Cornerstone Mortgage and is paid on a strictly commission basis.  In the past several years, Mr. Castellaw has been employed with Bank of America, Chase, Countrywide and Cherry Creek Mortgage.  Mr. Castellaw was quite successful as a mortgage broker in years past—according to his testimony—earning in excess of $300,000 per year.  However, financial problems started in 2005, when he joined a company called Cherry Creek Mortgage, and was required to fund start up costs in connection with the company's entry into the Texas market.  Mr. Castellaw and Cherry Creek Mortgage later became embroiled in disputes and litigation.  Mr. Castellaw earned around $100,000 in gross income in each of years 2006 and 2007.  Mr. Castellaw joined his current employer, Cornerstone Mortgage, in July 2008 (right before filing bankruptcy) and earned approximately $47,000 with Cornerstone the last six months of 2008.  The Debtors represented in their Schedule I filed in their

bankruptcy case that "business has begun to pick up" and Mr.
Castellaw expects commissions to gradually increase.  UST Exh. 1.
As for Mrs. Castellaw, she is a Registered Nurse, and has worked
at all relevant times as a part-time school nurse, earning around
$1,800 per month in take home pay.  The Debtors have no school
age children, both of their children having finished college.
However, the Debtors do claim their 22-year-old son as a
dependent.

B.   Assets of the Debtors.

        The Debtors have the following assets: an approximately
3,600 square foot home in University Park, Texas, which they
value at $1.2 million and which has $952,773.61 secured
indebtedness associated therewith (the monthly mortgage payments
thereon are $5,100 per month); three cars (a 2008 Chevrolet
Suburban valued at $48,000; a 2004 Volvo valued at $24,500 which
is a leased vehicle, and a 2006 GMC Yukon which is valued at
$26,000 and is driven by the Debtors' 22-year-old son), total
payments on which aggregate $1,948;[6] a 2004 model Bennington deck
boat valued at $17,000; two "lower bowl" season tickets with
platinum parking for the Dallas Mavericks professional basketball
team (which the Debtors originally did not list in their

---

        [6]*See* Debtors' original Schedule J filed in case.  UST Exh.
1.

-6-

Bankruptcy Schedules, allegedly because they did not think they needed to, since they had sold the seats this season to a third party); several term life insurance policies (with face values in excess of $2 million); teacher retirement; miscellaneous bank accounts with a small amount of funds; and miscellaneous household items.

C.    Liabilities of the Debtors.

In addition to their home mortgage of approximately $952,773.61, the Debtors have secured debt associated with their cars (approximately $70,000, plus a car lease obligation); secured debt associated with their boat ($26,000); and approximately $593,339 of unsecured debt, including (i) $270,000 owed to Mr. Castellaw's brother-in-law for loans he made to the Debtors in 2007 to try to help them get out of debt; (ii) $130,000 of student loan indebtedness; (iii) $179,000 of bank and credit card debt; (iv) $13,500 disputed debt associated with a business lease; and (v) $2,200 associated with a boat slip at a marina.  The Debtor testified that all of the unsecured credit card debt was incurred between February 2007 and the Petition Date.

D.   Certain Events Leading up to the Bankruptcy Filing.

Mr. Castellaw confirmed in testimony the following things that the UST argued were problematic.  First, that he had

borrowed $200,000 from his brother-in-law in January 2007, and
then borrowed $70,000 more from him in the May-July 2007 time
frame, all of which was lent to help the Debtors get out of the
financial hole that they had dug. However, not only did they not
get out of their financial hole, but the hole was significantly
deeper by the Petition Date—with the total unsecured debt being
close to $600,000. This was true, despite the fact that the
Debtors sold some rental property they owned in College Station,
Texas, in February 2008, clearing $31,000 net proceeds for the
Debtors; and also despite the fact that the Debtors drained over
$26,000 from pension and 401(k) plans in 2008, and also obtained
a $6,000 loan from one of the Debtors' mothers. Second, Mr.
Castellaw confirmed that he bought a $48,000 Chevrolet Suburban
in late 2007—during the middle of all the Debtors' financial
strife. Mr. Castellaw testified that he needed this nice vehicle
as part of his job as a mortgage broker. Third, the Debtors took
a vacation to Florida the month before they filed bankruptcy.
The Debtors testified that this was for a family reunion that
they had planned back in March 2008, and they felt their family
was counting on them to go. Finally, although the Debtors built
up significant unsecured debt in the months leading up to
bankruptcy, they at all times kept current on their secured
debt—including their home, boat and three cars (Mr. Castellaw

-8-

testifying that he was worried about keeping clean credit).

E. <u>Certain Acts of the Debtors Bearing on Candor in Their Case.</u>

Finally, the court will note certain evidence that the UST argued bears on the Debtors' candor with the court. The Debtors originally did not schedule the following assets in their case: four Chase Bank Accounts (one of which had been used to pay for expenses on the Florida vacation and Mavericks tickets); a storage unit (which Mr. Castellaw testified contains "junk"); a safety deposit box at Bank of America; and a small lot in Cameron County, Texas, that Mr. Castellaw says is worth $250.

**III. Conclusions of Law.**

The court finds that the totality of circumstances of the Castellaws' financial situation, as summarized herein, demonstrates "abuse," pursuant to section 707(b)(1) and (3). Among the most compelling and significant factors here are the following:[7]

1. There has been no catastrophic event (injury, illness, layoff, death, divorce) that has beset these Debtors, other than the economic events affecting the mortgage industry in which Mr.

---

[7]For a good discussion of the factors that courts have historically relied on in evaluating abuse under section 707(b), see Judge Rhoades' opinion in *In re King,* 2009 WL 62252 (Bankr. E.D. Tex. Jan. 6, 2009), at *4.

Castellaw has been employed.

2. The Debtors' budget is, by any measure, excessive considering their family size (dependents), income level, and all other surrounding circumstances and needs of the Debtors. The Debtors are devoting excessive financial resources toward their housing and vehicles, to the detriment of their creditors. No special circumstances were offered by the Debtors to warrant an expenditure for housing, in particular, that is several multiples (specifically, five times) higher than the Local Housing and Utilities Standards housing allowance for a family of three in Dallas County.[8] UST Exh. 18. In sum, resources that the Debtors are presently using to pay for housing and transportation can be reallocated for the benefit of their unsecured creditors.

3. Relatedly, the Debtors could have easily reduced their life expenses (and still can) without depriving themselves of basic necessities. The Debtors signed reaffirmation agreements to assume two of their expensive cars—although they have recently suggested they have changed their intent in that regard and have no objection to the lenders picking up their vehicles.

4. Additionally, the Debtors have relatively stable income

---

[8]www.usdoj.gov/ust/eo/bapcpa/20080317/bci_data/housing charts/irs_housing_charts_TX.htm

and resources.  Not only have the Debtors, despite their
financial woes, still been earning more than $100,000 per year
the past 2-3 years that they have described as so tough for them,[9]
but the court cannot help but note that the Debtors have degrees
in two of the most "in demand" and stable fields in our economy.
As mentioned, Mrs. Castellaw is a Registered Nurse working only
part time, and Mr. Castellaw is a former teacher.  Unlike many
sad people who appear in this court, with limited skills or
education, the Castellaws have wonderful "fallback" degrees they
could now use to support themselves.  And further on the topic of
resources, the Debtors have had tremendous resources that many
others who come before this court do not have (*e.g.,* a brother-
in-law capable of loaning $270,000; a rental house they sold that
yielded some needed cash; significant retirement resources).  And
yet, they have not taken advantage of this all in a prudent way.
As counsel for the UST put it, the Debtors had a chance at a
fresh start outside of bankruptcy, due to these family loans and
other cash resources, and they did not properly seize it.

---

[9]The court can consider postpetition developments (including
income) in determining whether dismissal under section 707 is
appropriate.  *Cortez*, 457 F.3d at 455-58.  Mr. Castellaw
testified that the Debtors' postpetition income has been in
excess of $9,000 per month in July-December 2008, and Mr.
Castellaw represented to his mortgage company in December 2008
that his family income was $11,000 per month.  UST Exh. 7.

5.  The Debtors, in this court's view, have the ability to repay a substantial portion of debt from future income.

6.  The court also finds significant and wholly unjustifiable the Debtors' eve-of-bankruptcy purchases.  The Chevrolet Suburban purchased months before the bankruptcy case was a luxury item by any reasonable measure.  The trip to Florida a month before filing bankruptcy cannot be rationalized and was a luxury by any definition.  It is an affront to the integrity of the bankruptcy system when debtors are not only *not* "acting their wage"—to borrow a phrase from a popular media personality—but are literally showing no signs of meaningful belt-tightening in the midst of a financial crisis and are engaging in luxury purchases. A luxury item is defined in Webster's Dictionary as something not essential but rather conducive to comfort or pleasure.  *See In re Oot,* 368 B.R. 662, 667 (Bankr. N.D. Ohio 2007).  As a general matter, the retention of multiple luxury items is hard to reconcile with the existence of good faith.  Good faith has been defined, among other ways, as the absence of intent to seek unconscionable advantage.  *Id.* at 668.  Here, the court finds that the Debtors would be seeking and realizing an unconscionable advantage if the court allowed them to proceed in this case. Discharge in Chapter 7 is not meant for those enjoying a substantial income and seeking to transfer the cost of an

-12-

unnecessarily extravagant lifestyle to creditors.  This is what would, in essence, be happening if the court allowed this case to proceed.

7.   Finally, the court cannot ignore the apparent lack of candor here, with the omission of various assets.  While the Debtors did "come clean" and admit to the omissions, it was only after investigations by the UST, and the Debtors only amended their sworn bankruptcy schedules a few days before the trial on the Motion to Dismiss.

In summary, the court does not believe the Castellaws are bad people.  And, clearly, they have a financial situation they are facing that requires some major solutions if they are going to have peace and happiness in their lives any time soon.  But the court believes that this is the classic "abuse" that Congress instructed bankruptcy courts to police and to usher out of Chapter 7.  It is, therefore,

**ORDERED, ADJUDGED AND DECREED** that the Motion is granted and the Debtors' Chapter 7 case is hereby **DISMISSED WITH PREJUDICE** to the refiling of a Chapter 7 case for 180 days.

###END OF MEMORANDUM OPINION AND ORDER###